**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-CIV-24000-BLOOM/Valle**

DOLLY PRETTY CALVO and other
similarly situated individuals,

      Plaintiff(s),

v.

B & R SUPERMARKET, INC. d/b/a
MILAM'S MARKET,

      Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Motion for Summary Judgment, ECF No. [34] (the "Motion"), filed by Defendant B & R Supermarket, Inc. ("Defendant"). This action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"). Plaintiff Dolly Pretty Calvo ("Plaintiff") alleges that Defendant failed to appropriately compensate her for her work in excess of forty hours per week in violation of the statute, and claims roughly $21,000 in actual damages and the same in liquidated damages. Defendant, in the instant Motion, contends that Plaintiff falls within both the executive and administrative exemptions to the FLSA's requirements. Plaintiff responded in objection to the Motion, ECF No. [47] (the "Response"), and Defendant timely replied, ECF No. [53] (the "Reply"). The matter is now ripe for adjudication. The Court has reviewed the Motion, all supporting and opposing filings and submissions, and the record in the case. For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.      PLAINITFF'S DECLARATION IN REPONSE

In support of her Response to the Defendant's Motion, Plaintiff filed a statement of facts in opposition to Defendant's statement of facts, attached to which is a sworn declaration by Plaintiff.  See ECF No. [48-1] ("Plaintiff's Declaration").  Plaintiff's counter-statement of facts and Response are grounded in large part on Plaintiff's Declaration.

When considering a motion for summary judgment, "[a] district court may disregard an affidavit as a sham when a party to the suit files an affidavit that contradicts, without explanation, prior deposition testimony on a material fact."  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012) (citing *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)); *see also Wallace v. Pub. Health Trust of Dade Cnty.*, 370 F. Supp. 2d 1247, 1250 (S.D. Fla. 2005) ("affidavit [which] attempts to contradict clear deposition testimony to defeat summary judgment, [] is impermissible"); *Pennant v. Convergys Corp.*, 368 F. Supp. 2d 1307, 1312 (S.D. Fla. 2005) ("The Court 'may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.'") (quoting *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003)); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1275-76 (S.D. Fla. 2004) ("A party opposing summary judgment may not substitute an affidavit alleging helpful facts in place of earlier deposition testimony in hopes of avoiding summary judgment.").  The sham affidavit rule is appropriate when "earlier deposition testimony . . . consist[s] of clear answers to unambiguous questions which negate the existence of any genuine issue of material fact."  *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (quotations omitted); *see also Houlihan Lokey Howard & Zukin Capital, Inc. v. Protective Grp., Inc.*, 506 F. Supp. 2d 1230, 1245 (S.D. Fla. 2007) ("[B]efore disregarding an affidavit as a sham, there must

be an unexplained inherent inconsistency between the deposition testimony at issue and the affidavit.") (citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)). "The . . . sham affidavit rule applies with equal force to declarations." *Hamilton v. Coffee Health Grp.*, 949 F. Supp. 2d 1119, 1126 (N.D. Ala. 2013).

Plaintiff's Declaration consists in large part of self-serving statements and opinions otherwise unsubstantiated by the record before the Court. Throughout her Declaration, Plaintiff specifically contradicts her own deposition testimony. *See* ECF No. [34-3] ("Plaintiff's Deposition Transcript"). Moreover, Plaintiff has not explained the inherent inconsistencies between her deposition testimony and the Declaration. Therefore, Plaintiff's Declaration cannot alone create a genuine issue of material fact, and the Court will disregard Plaintiff's Declaration when and to the extent it contradicts Plaintiff's deposition and other clear record evidence. *See Pennant*, 368 F. Supp. 2d at 1312 (disregarding plaintiff's affidavit as a sham); *Hamilton*, 949 F. Supp. 2d at 1127 (striking contradictory portions of plaintiff's declaration); *Moore*, 352 F. Supp. 2d at 1276 ("Plaintiff's affidavit is stricken from the record insofar as it is inconsistent with Plaintiff's deposition testimony"); *Aira v. Best Nat. Vending, Inc.*, 2012 WL 4935086 , at *9 (S.D. Fla. Oct. 16, 2012) ("To the extent that his subsequent affidavit attempts to create a fact question . . . it is a sham and will not be considered.").

## II.   MATERIAL FACTS

Defendant owns and operates four grocery stores in Miami-Dade County, Florida. ECF No. [34-3] ("Max Milam Declaration") ¶ 5. Plaintiff was employed as an Assistant Store Manager in Store # 4, located in Sunny Iles Beach, Florida (the "Store"). *Id.*; ECF No. [34-5] ("Callejas Declaration") ¶¶ 1, 3; Pl. Dep. Tr. 34:3-5; 209:21-210:12. Plaintiff worked at the store for approximately thirteen years, the first five years as an associate and the last eight years

as an Assistant Store Manager.  Pl. Decl. ¶ 4.  Plaintiff was terminated by Defendant in June, 2013.  Pl. Dep. Tr. 14:24-17:3; Pl. Decl. ¶ 4.

During the last three years of Plaintiff's employ at the Store, Robert Callejas acted as the Store Manager.  Callejas Decl. ¶ 1; Pl. Dep. Tr. 45:22-46:7.  Plaintiff and the only other Assistant Store Manager, Nancy Beltran, reported directly to Callejas.  Callejas Decl. ¶ 3.; Pl. Dep. Tr. 45:22-46:7.  After Callejas, Plaintiff and Beltran were the next highest ranking employees in the Store.  Callejas Decl. ¶ 3; Pl. Dep. Tr. 103:11-104:18.  Plaintiff describes Beltran as the "first assistant."  *See*, *e.g.*, Pl. Dep. Tr. 89:18; 97:20-23; 197:19-21.  Callejas, Plaintiff and Beltran were the only on-site managers in the Store with authority over the Store's operations and other employees who worked at the Store.  Callejas Decl. ¶ 3; *see also* Pl. Dep. Tr. 113:2-3.

The Store is open seven days a week from 7:00 a.m. to 11:00 p.m.  Callejas Decl. ¶ 4. Callejas, Plaintiff and Beltran's schedules were set to ensure that one of them was present in the store at all times when it was open for business.  *Id*.; ECF No. [34-7] (Sample Schedules). Callejas' normal work schedule was 5:00 a.m. to 5:00 p.m. on all days except Wednesday and Sunday.  Callejas Decl. ¶ 5.  Beltran and Plaintiff normally took off alternating Fridays and Saturdays. Id. ¶ 4; Sample Schedules.  Beltran worked the opening shift on two days, from 5:00 a.m. to 4:00 p.m., and closing shift on two days, from 3:00 p.m. to 12:30 a.m., and the mid-day shift once a week, from 11:30 a.m. to 9:00 p.m.  Callejas Decl. ¶ 5.  Plaintiff typically worked the closing shift, from 3:00 p.m. to 12:30 a.m.  Pl. Dep. Tr. 54:20-55:12.  Plaintiff, central to her claim but not critical to the instant Motion, disputes that she worked only forty-five to forty-eight hours a week.

4

Plaintiff was the highest ranking employee in the Store from roughly 5:30 p.m. to 12:30 a.m. two to three days a week, and from 9:00 p.m. to 12:30 a.m. two to three day a week.  *Id*. 102:2-104:18; 112:22-113:3; Sample Schedules.  Plaintiff's shift overlapped with that of her immediate supervisor, Callejas, three days a week for two hours each shift.  *Id*.; Callejas Decl. 6. The combined overlap between Plaintiff's scheduled hours and those of Callejas and Beltran totaled about thirteen hours weekly.  Of the forty-five hours she was scheduled to work each week, Plaintiff worked roughly thirty hours as the sole Store Manager or Assistant Store Manager.  During those times, Callejas characterized Plaintiff as the "Acting Store Manager." Callejas Decl. ¶ 7.

Defendant's corporate management (its President, Executive Vice President, Vice President, and Vice President of Retail Operations) are located at Defendant's corporate headquarters in Miami Springs, Florida.  M. Milam Decl. ¶ 4.  During her last three years at the Store, Plaintiff saw Defendant's President, Allen Milam, and Vice President, A.J. Milam, two to three times each.  Pl. Dep. Tr. 101:6-12, 14-22.  Plaintiff interacted with Defendant's Executive Vice President, who would call the Store on occasion while monitoring activities there from Defendant's corporate offices, three to four times by phone during the same period.  *Id*.  101:1-5; 113:20-115:22.  Plaintiff saw Norman Orths, Defendant's Vice President of Retail Operations, once or twice a month.  *Id*. 100:8-25.

The Store was divided into several different departments, such as dairy, produce, deli, and grocery.  Pl. Dep. Tr. 198:25-199:14.  Certain departments employed hourly employees referred to as Department Managers, who would report directly to Callejas, Beltran, and Plaintiff.  *See, e.g., id*. 67:19-21; 179:24-180:3.  The Store also employed lead workers, cashiers, baggers, stockers, clerks, and a data entry employee, most of who were hired at the prevailing

minimum wage rate.  Callejas Decl. ¶ 19-20.  Of the sixty-eight to seventy-five associates employed at the Store, Plaintiff supervised between twenty and thirty employees on her shifts. *Id*. 47:2-25; Callejas Decl. ¶ 20; M. Milam Decl. ¶ 5.

On days when Plaintiff's shift overlapped with Callejas, Plaintiff would start her shift by reporting to Callejas.  Pl. Dep. Tr. 55:9-12.  Callejas would update Plaintiff for fifteen to twenty minutes as to "pertinent" matters or ongoing issues at the Store, such as the daily sales volume to that point, whether any associates had called in sick, and if any repair or service issues were pending at the Store.  *Id*. 55:13-17; Callejas Decl. ¶ 7.  With the exception of periodic management meetings (described below), Plaintiff rarely saw Callejas during the remainder of their shifts' overlap after that initial meeting.  Pl. Dep. Tr. 56:22-57:3; Callejas Decl. ¶ 7. Callejas and Plaintiff rarely interacted after the former's shift ended; on occasion, Callejas would call Plaintiff for a day-end update of the total sales figures, and, on the rarest of occasions, Plaintiff might call Callejas in case of emergency.  Callejas Decl. ¶ 10.

After her initial meeting with Callejas, Plaintiff would begin walking the Store to monitor and assess the Store's overall operations, including gauging customer flow, determining optimal employee assignment, ensuring Store organization, and attending to customer service issues.  Pl. Dep. Tr. 55:14-17, 57:4-25.  Throughout the course of her shift, Plaintiff oversaw and ensured that the Store's employees were doing their jobs (and doing them in adherence to company policies), and that all operations at the Store ran smoothly, properly and efficiently.  *Id*. 58:24-59:11, 59:23-60:3, 60:18-21; 81:9-12; 131:1-11; 139:23-25.  For example, Plaintiff would monitor the check-out lines, the cashiers and baggers, and the deli counter to prevent customer build-up at the checkout or deli lines; ensure that shopping carts did not accumulate outside the Store; monitor whether shelves, tables, coolers and freezers were adequately stocked with

merchandise for purchase; ensure a steady supply of pre-made and pre-cut items; and monitor overall Store cleanliness. *Id*. 57:6-11; 60:22-24, 139:8-25, 157:2-158:21.  Plaintiff used a checklist to assign employee attendance to and to monitor specific tasks, including general cleaning, sweeping/mopping floors, supplying the bathroom, re-stocking supplies, checking aisles for debris or boxes, retrieving shopping carts, and taking out the trash. *Id*. 139:17-140:23, 162:3-8, 163:1-11; ECF No. [34-6] (sample checklist).  Plaintiff routinely assigned work to Store employees.  Pl. Dep. Tr. 63:13-64:2, 139:12-16, 140:1-13, 147:4-12, 159:8-13.  At times, Plaintiff instructed an employee to re-do a task not performed correctly. *Id*. 168:6-10.  Plaintiff maintained the Store's inspection log in order to monitor the timely and correct arrival of deliveries. *Id*. 139:1-7.  Plaintiff described her work style as "proactive" and involving "multitasking." *Id*. 176:17-23; 183:12-14.

Plaintiff prepared the weekly work schedule for all front-end personnel on all shifts, a task delegated to her by Callejas.  Pl. Dep. Tr. 64:16-69:25, 71:25-72:16; Callejas Decl. ¶ 12. Plaintiff drafted the schedule (often after hours, at her own home) and reviewed it with Callejas. *Id*.  The weekly work schedule was not static, but would change week-to-week depending on the Store budget or certain high-volume time periods.  Callejas Dec. ¶ 13.  In preparing the schedule, Plaintiff would adhere to certain parameters or guidelines set by Callejas and store policy, chiefly pertaining to employee work hours allowable by regulation and other employee-specific scheduling concerns.  Pl. Dep. Tr. 74:17-75:12, 81:9-24, 82:20-83:4; Callejas Decl. ¶ 13. Callejas and Plaintiff discussed, and Callejas would resolve, certain overall scheduling issues, such as adding more cashiers or baggers to the schedule during high volume periods.  Pl. Dep. Tr. 85:6-21.  Callejas had final approval over the schedule, and made occasional adjustments to the schedules prepared by Plaintiff. *Id*. 69:20-25, 78:23-25, 69:12-19; Callejas Decl. ¶ 14.  After

January 2013, the Store began using a computerized scheduling system, which partially alleviated Plaintiff's burden and responsibility regarding scheduling.   Pl. Dep. Tr. 204:25-205:24; Callejas Decl. ¶ 13.

Part of Plaintiff's job was ensuring that the Store's employees observed the hours that they were scheduled to work.   Pl. Dep. Tr. 119:20-120:7.   Plaintiff had and exercised the authority to review and make upwards or downwards adjustments to the electronic timekeeping and time card system used by Defendant to record employee work hours.   *Id*. 91:24-93:1, 95:9-97:11; ECF No. [53-2] ("A.J. Milam Declaration") ¶ 8-10 and attachments.   During her shifts, Plaintiff was alone responsible for finding substitute employees in case of employee sickness or absence.   *Id*.   65:12-67:1, 87:6-13; Callejas Decl. ¶ 16.   In doing so, she adhered to the Store policies and interests, such as avoiding employee overtime work, delineating work hours for minors and accommodating associates' needs for time off.   *Id*.; Pl. Dep. Tr. 82:15-25, 70:14-22. Plaintiff was also authorized to instruct employees to clock out before the end of their shift if the Store was not busy, in order to save on labor costs.   Pl. Dep. Tr. 137:17-20; Callejas Decl. ¶ 17.

Plaintiff had responsibilities pertaining to employee hiring, training and discipline. Callejas delegated to Plaintiff the responsibility for conducting initial applicant interviews. Callejas Decl. ¶ 18.   When on shift, Plaintiff would administer an initial application and interview to all potential employees.   Pl. Dep. Tr. 134:7-136:21.   The initial application consisted of a pre-set list of ten questions.   *Id*. 200:3-201:6.   Plaintiff would also note her specific or overall impressions regarding the applicant's suitability for employment at the Store.   *Id*. 134-24-136:1.   Her notations at times included specific issues, such as when an applicant was unsuitable for hire regardless of their answers to the paper application, as well as Plaintiff's recommendations to or not to hire the applicant.   *Id*.   The vast majority of the time, Callejas

accepted Plaintiff's recommendation to or not to interview and hire an applicant; Plaintiff could recall only a few instances of an applicant's hiring against her recommendation.  Callejas Decl. ¶¶ 18, 23 ;Pl. Dep. Tr. 136:18-21.

In terms of employee training, Plaintiff trained new cashiers and customer service hires, evaluated the progress of new employees during their initial probationary period, provided Callejas with her recommendations regarding whether an employee had or should progress through their probationary period, and coached employees on how to perform their jobs more efficiently.  Pl. Dep. Tr. 83:9-11, 166:17-168:16, 171:17-172:8.

Plaintiff enforced Store policy and promoted its goals, such as sales and customer service, by disciplining Store employees.  She admonished employees who were not adhering to store policy, such as failing to wear Store uniforms, using their cell phones during work hours, cursing, or acting inappropriately in the Store's back room.  *Id*. 59:23-61:3; 131:1-11, 128:16-129:8; 169:5-23.   Plaintiff had and exercised the authority to send an associate home as a sanction for missing a shift without a "good excuse."  *Id*. 120:22-121:12; ECF No. [53-4] (write-ups of employees by Plaintiff).   Plaintiff determined, on her own and at the time of the employee's infraction, whether the employee had provided a "good excuse."  Pl. Dep. Tr. 120:22-121:12, 122:23-124:6.   Plaintiff wrote up employees for violations of Store and Defendant policy.   ECF No. [53-4].   Plaintiff made recommendations to Callejas about appropriate levels of discipline, including termination.  *Id*. 124:16-19, 126:1-4; ECF No. [53-4]; Callejas Decl. ¶¶ 22, 23.   Callejas understood Plaintiff's supervisory authority to include discipline up to but excluding termination.  Callejas Decl. ¶ 22; *see also* Pl. Dep. Tr. 127:18-128:12.   Callejas generally accepted Plaintiff's recommendations as to disciplinary measures within Callejas' ultimate purview.  Callejas Decl. ¶ 23; Pl. Dep. Tr. 125:22-126:4.

9

Plaintiff also attended to certain safety and risk-management issues.  Like all Store employees, Plaintiff monitored the Store for conditions that could cause accidents. Pl. Dep. Tr. 60:4-9; 132:11-134:1.  Plaintiff was responsible for reporting and writing reports about all accidents that occurred in the Store on her shift.  *Id.* 132:11-134:1.  Plaintiff also monitored the Store for theft and shoplifters, taking special care to employ the discretion necessary to avoid potential lawsuits against Defendant when confronting potential shoplifters.  *Id.* 151:5-17. Plaintiff monitored the handling of food products (ensuring compliance with, e.g., cross-contamination and proper temperature requirements) prepared and sold in the Store.  *Id.* 143:16-144:12.  When she was the only Store manager on duty, she was the sole certified food manager. *Id.* 144:24-145:13.  As a result, at those times, the Store could not remain open without Plaintiff's presence.  *Id.*

Plaintiff spent a sizeable portion of her work day attending to customer service issues. Pl. Dep. Tr. 49:13-50:16; 57:22-25; 109:9-112:12, 172:13-175:16, 178:5-179:5.  This included attending to customer complaints, engaging in up-selling, and assisting regular customers with their shopping needs.  *Id.*  Plaintiff had sole authority to address and resolve customer complaints during her shifts, within the instructive parameters set by Callejas and Store policy.  *Id.* 109:9-112:3; Callejas ¶ 9.  Plaintiff had sole authority to void purchases and make refunds during her shifts.  Pl. Dep. Tr. 112:6-12; 164:12-23.  Plaintiff described excellent customer service as Defendant's most important Store policy.  *Id.* 49:23-25, 109:9-112:12.

Throughout her day, Plaintiff engaged in manual tasks, including tasks generally done by the Store's hourly-wage employees.  This included expediting at the checkout lines, assisting at the deli or produce counters, stocking the shelves, retrieving shopping carts from the parking lot, re-stocking display tables, making garlic bread and opening the back door to assist with trash

disposal.   Pl. Dep. Tr. 60:22-61:25, 148:23-149:25, 155:8-157:25, 158:14-160:13.   Plaintiff would "assist in whatever needed to be done."  *Id*. 61:8.   If Plaintiff was assisting at the deli counter and a customer requested to see the manager, Plaintiff would leave the deli counter to respond to the waiting customer.  *Id*. 160:14-162:2.

Plaintiff was responsible for the Store's closing at the end of her shifts.  Pl. Dep. Tr. 63:09-64:2.   Plaintiff would conduct a closing walk around.  *Id*.   She monitored the tills, collected and reconciled the daily register receipts, determined the final sales figures and entered those figures into the Store's computer.  *Id*. 136:22-137:7; Callejas Decl. ¶ 28.   Plaintiff was required to complete a day end sales report.  *Id*. 178:2-4.   Plaintiff would typically leave a day-end report concerning sales and tasks for Callejas on his desk.  *Id*. 162:22-164:11.   Callejas stated that he depended on Plaintiff, as the closing manager, to make sure that the Store was clean, stocked, well-organized and ready to open for business the next morning.  Callejas Decl. ¶ 21.

During the final months of Plaintiff's employ, Callejas, Beltran and Plaintiff met periodically (up to once a week) to discuss certain management issues, such as changes to Defendant's corporate policies, the Store budget, risk management issues, enforcement of food safety regulations, ways to prevent spoilage, personnel matters and the Store's progress in meeting Defendant's corporate goals.  Pl. Dep. Tr. 99:23-100:7; Callejas Decl. ¶ 11.  The Store also contained an office for the exclusive use of managers, i.e., Callejas, Beltran and Plaintiff. Pl. Dep. Tr. 164:24-165:5.   The office contained a safe and a computer from which Callejas, Beltran and Plaintiff accessed Defendant's confidential information, including budgets, mark ups and sales figures.  *Id*. 165:6-21; 181:20-182:3.

Plaintiff described her principal duties as sales, customer service, and supporting the Store's goals of customer satisfaction and maximizing profitability.  Pl. Dep. Tr. 58:1-20, 157:24-25, 176:17-178:1, 182:14-183:8, 193:10-16.  Plaintiff acknowledged that the manual tasks she performed was not the reason for her hire.  *Id*. 182:10-16.  She described her job as involving leadership.  *Id*. 183:22-184:4.  Callejas "depended on the Assistant Store Managers to use their best judgment when managing the Store and handling employee, customer, vendor and operational issues" and "depended on [Plaintiff] to make good decisions" when she was the "sole manager on duty."  Callejas Decl. ¶ 8.

As an Assistant Store Manager, Plaintiff earned a salary of $900 per week until December 30, 2012, when her salary was increased to $950 per week.  ECF No. [48] ¶ 62; Pl. Dep. Tr. 44:7-45:4, 50:17-51:22, 170:5-11; Callejas Dep. ¶ 29.  Plaintiff, along with only Callejas and Beltran, was eligible for a year end incentive bonus.  *Id*.  Plaintiff's combined annual salary and year-end incentive bonus totaled between $48,000 and $50,000.  Most of the employees under Plaintiff's supervision earned between roughly $22,000 and $23,000 per year.  Pl. Dep. Tr. 170:25-171:7; Callejas Decl. ¶ 19.

## III.    SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it

12

"might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor.").

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (noting a court must not weigh conflicting evidence nor make credibility determinations when ruling on a motion for summary judgment); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Gary v. Modena*, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Rule 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11,

2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## IV.   <u>ANALYSIS</u>

The FLSA provides that employers must compensate employees at a rate of one and a half times their regular rate of pay for each hour worked in excess of forty hours per week. 29 U.S.C. § 207(a). There are, however, exemptions from the overtime pay requirement, which depend on the type of work performed by the employee. "Any employee 'employed in a bona fide executive, administrative, or professional capacity' need not receive overtime compensation in accordance with the requirements of 29 U.S.C. § 207(a)." *Posely v. Eckerd Corp.*, 433 F.

Supp. 2d 1287, 1298 (S.D. Fla. 2006) (quoting 29 U.S.C. § 213(a)(1)).  The question currently before the Court is whether Plaintiff falls within the executive or administrative exemptions within the meaning of the FLSA.

"Exemptions under the FLSA are to be construed narrowly against the employer who asserts them." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995); *see also Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997) (same).  The employer bears the burden of proving that an employee is exempt from overtime payments.  *Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 804 (11th Cir. 1991); *Bagwell v. Florida Broadband, LLC*, 385 F. Supp. 2d 1316, 1322 (S.D. Fla. 2005) ("The employer carries the burden of proving the exemption, and the overtime provisions of the FLSA are narrowly construed against the employer.") (citing *Hogan v. Allstate Ins. Co.,* 361 F.3d 621, 625 (11th Cir. 2004)).  "In addition, the Defendant employer[] must prove the applicability of an exemption by clear and affirmative evidence." *Altman v. Sterling Caterers, Inc.*, 879 F. Supp. 2d 1375, 1379 (S.D. Fla. 2012) (citing *Klinedinst v. Swift Invs., Inc.,* 260 F.3d 1251, 1254 (11th Cir. 2001)).

"Congress expressly authorized the Secretary of Labor to define the scope of the executive, administrative, and professional employee exemptions [in section 213(a)(1) ]." *Avery v. City of Talladega,* 24 F.3d 1337, 1340 (11th Cir. 1994) (citation omitted).  "To determine whether a genuine issue exists about whether Plaintiff qualified as an "administrative" or "executive" employee within the meaning of section 213(a)(1), the Court looks to applicable case law and to the Code of Federal Regulations." *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1312 (S.D. Fla. 2008).  "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Avery*, 24 F.3d at

15

1340 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

###### A.     <u>Executive/Managerial Exemption</u>

Defendant maintains that Plaintiff qualifies as an "executive" employee under the FLSA and is thus exempt from the statute's overtime wage requirements. "According to Department of Labor Regulations, the employer must satisfy both a 'salary basis' test and a 'primary duties' test to demonstrate that an employee qualifies for this exemption." *Altman*, 879 F. Supp. 2d at 1381 (citing *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625-26 (11th Cir. 2004) (adopting the salary/duties tests from the DOL regulations as the tests for whether the executive exemption applies); 29 C.F.R. § 541.200). Specifically, the relevant Department of Labor regulations provide a four part test which defines the term "employee employed in a bona fide executive capacity" to mean any employee:

> (1)  Compensated on a salary basis at a rate of not less than $455 per week . . .;
> (2)  Whose primary duty is management of the enterprise in which the employee is employed . . .;
> (3)  Who customarily and regularly directs the work of two or more other employees; and
> (4)  Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

Here, the parties agree that Plaintiff was compensated at a rate greater than $455 per week, and that she supervised and directed the work of more than two employees. Therefore, only the second and fourth prongs remain for the Court's consideration.

###### 1.     <u>Determining Whether An Employee's Primary Duty is Management</u>

"The central question regarding application of the executive exemption is whether Plaintiff's 'primary duty' was 'management.'" *Brillas v. Bennett Auto Supply, Inc.*, 675 F. Supp.

2d 1164, 1168 (S.D. Fla. 2009).  "Of course, merely having the title 'manager' is not talismanic, and the Court must still engage in a fact-specific inquiry to determine whether Plaintiff's most critical duties to the enterprise were his exempt managerial duties."  *Rutenberg v. Boynton Carolina Ale House, LLC*, 2010 WL 135100, at *3 (S.D. Fla. Jan. 8, 2010) (citing *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008) ("When it comes to deciding whether an employee is an executive within the meaning of the FLSA, the answer is in the details.")).  In applying the exemption, "[h]ow an employee spends her time working is a question of fact, while the question of whether the employee's particular activities exclude her from the overtime benefits of the FLSA is a question of law."  *Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297, 1301 (S.D. Fla. 2008) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

Department of Labor regulations elucidate the type of work that constitutes "management:"

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  The regulations further provide a list of factors and issues to consider in determining whether the employee's "primary duty" was management:

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the

employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register.

29 C.F.R. § 541.700(a)-(c).  The regulations also state that:

Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700.  Generally, exempt executives shall make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

29 C.F.R. § 541.106(a).

"An employee's 'primary duty' is determined based on all of the facts in a particular case, with emphasis placed upon the character of the employee's job as a whole." *Langley*, 530 F. Supp. 2d at 1300.  "[N]umerous courts have held that when considering the question concerning whether management was an employee's 'primary duty,' a more useful question is whether or not the employee's managerial duties constituted the primary value the employer

18

placed on the employee." *Brillas*, 675 F. Supp. 2d at 1168; *see also Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("the employee's primary duty is what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time"); *Bosch v. Title Max, Inc.*, 2005 WL 357411, at *6 (N.D. Ala. Feb. 7, 2005) ("A more useful question is whether or not [employee's] managerial duties constituted the primary value her employer placed upon her.").

Fundamentally, the amount or percentage of time spent by an employee on work claimed to be exempt is not dispositive. *See Pinillia v. Northwings Accessories Corp.*, 2007 WL 3378532, at *5 (S.D. Fla. Nov. 13, 2007) (the amount of time spent on work claimed to be exempt is not dispositive); *Altman*, 879 F. Supp. 2d 1383 ("[T]he analysis for the 'primary duty' test should not focus on whether Plaintiff spent most of his time on managerial duties; the test should instead focus on whether Plaintiff's managerial duties constituted the primary value Defendants placed on Plaintiff."); *Alvarez*, 541 F. Supp. 2d at 1316-17 (defendant could demonstrate plaintiff's primary duty was management by showing that "even though [plaintiff] spent less than 50 percent of his time performing management duties, he 'nonetheless meet[s] the primary duty requirement' because 'the other factors support such a conclusion'" (quoting 29 C.F.R. § 541.700(b))); *Moore*, 352 F. Supp. 2d at 1272-79 (finding an employee exempt although he spent 90% of his time on non-exempt work); 29 C.F.R. § 541.700(b) ("Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.").

As a highly relevant example, "[t]he person 'in charge' of a store is generally considered to have management as a primary duty, even if that person spends more aggregate time performing non-exempt duties and 'makes few significant decisions.'" *Rutenberg*, 2010 WL

135100, at *3 (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (11th Cir. 1982)); *see also Pendlebury v. Starbucks Coffee Co.*, 2008 WL 763213 (S.D. Fla. Mar. 13, 2008) (same); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 915 (E.D. La. 2009) (the "manager in charge" had management as his primary duty where they were "managers in charge" for all or the great majority of their workweek).  In this same vein, "[c]ases applying 29 C.F.R. § 541.700 hold that assistant managers are exempt as long as they perform some management tasks." *Brillas*, 675 F. Supp. 2d at 1164; *see also Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (holding that despite spending "90% of their time performing non-exempt tasks, including selling, operating the register and cleaning the store", plaintiff assistant managers were exempt where "they worked without supervision for a majority of their working hours, and thus were in charge of their respective stores during these times").

Following regulatory guidance, "the Court looks to several factors to help determine whether [Plaintiff's] primary duty was management even though he spent less than 50 percent of his time engaging in management duties . . . the amount of time spent performing exempt work . . . relative freedom from direct supervision . . . salary compared with wages paid to other [employees]." *Alvarez*, 541 F. Supp. 2d at 1317-18 (S.D. Fla. 2008).  Those "pertinent factors are not the only factors to be considered, nor that the presence or absence of any one factor is determinative." *Severin v. Pasha's Restaurants, Inc.*, 2007 WL 967021, at *6 (S.D. Fla. Mar. 22, 2007) (citing *Thomas v. Jones Restaurants, Inc.*, 64 F. Supp. 2d 1205, 1214 (M.D. Ala. 1999) (court must look at total picture; fast food manager who was solely in charge of restaurant while she was at work was exempt as executive-despite lack of evidence as to relationship between her salary and the wages paid to other employees)).

### 2.   <u>Plaintiff's Primary Duty Was Management</u>

Under the facts here not subject to dispute, it is clear that Plaintiff's "primary duty" was "management."  For the ample majority of her work-day, Plaintiff was the sole on-site employee with authority over Store operations and other employees.  Plaintiff supervised twenty to thirty Store employees.  She oversaw and ensured that those employees were properly assigned to necessary tasks and were attending to their responsibilities.   She monitored employee performance of specific tasks, and routinely assigned work to Store employees.  Plaintiff was responsible for setting the weekly work schedule for all of the Store's font-end employees.  Plaintiff had, and exercised, the authority to monitor and adjust employee time-cards.  She was responsible for finding substitute employees in case of employee sickness or absence.  In setting the schedule, filling absences, and attending to work-time adjustments, Plaintiff enforced and advanced the Store's employment policies and goals.  Plaintiff had a central role in hiring Store employees.  Plaintiff trained employees, evaluated the progress of new employees during their initial probationary period, coached employees on how to perform their jobs, and provided the Store Manager her recommendations regarding employee retention.  Plaintiff disciplined Store employees in order to enforce Store policies and advance its operational and overall goals.

The bulk of Plaintiff's responsibilities included managerial tasks:  monitoring and optimizing overall store operations, attending to issues of employee supervision, and ensuring that the Store's primary goals – sales and customer service – were met.  A sizeable portion of her day was spent attending to issue-specific customer service needs in a managerial capacity.  Plaintiff maintained a daily checklist of employee attendance, assignment and performance; was responsible for reporting any accidents; and prepared a daily sales report for the Store Manager.  Plaintiff was responsible for the Store's closing at the end of her shifts:  ensuring that employee

concluded all day-end tasks, collecting and reconciling daily register receipts, and determining final day-end sales figures.  Toward the end of her tenure with Defendant, Plaintiff, along with the Assistant Store Manager and  Store Manager, held meetings to discuss certain management issues, such as changes to Defendant's corporate policies, the Store budget, risk management issues, enforcement of food safety regulations, personnel matters and the Store's progress in meeting Defendant's corporate goals.  Reflecting her management position, Plaintiff (along only with Callejas and Beltran) had access to the Store's office, the Store's safe, the Store's computer, and Defendant's confidential budget and sales information.

The fact that Plaintiff also performed a variety of manual tasks – including filling in for the Store's hourly employees in executing their tasks – does not negate the primacy of her managerial role.  "[O]ne can still be 'managing' if one is in charge, even while physically doing something else."   *Donovan*, 672 F.2d at 226.   Courts have repeatedly found the FLSA's managerial exemption satisfied even where the employee spent upwards of 80-90% of her day performing  manual  tasks  alongside  other,  non-management  employees,  so  long  as  the employee's primary role was management.  *See*, *e.g.*, *Severin*, 2007 WL 967021, at *4 ("Even if Plaintiff spent 80% of her time on non-exempt duties, the record reveals that Plaintiff's primary role was managerial."); *Moore*, 352 F. Supp. 2d at 1272-79 (holding that store manager was exempt executive with primary duty of management even though he spent 90% of his time on non-exempt work); *Jackson*, 362 F. Supp. 2d at 1334 (holding that employer was exempt as to assistant store managers who spend 90% on non-exempt work because "such duties were performed simultaneously with their managerial functions").

In fact, "the case law is replete with decisions holding managers of retail establishments to be exempt, notwithstanding the fact that they spent the majority of their time performing non-

exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate superiors."  *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1302-03 (S.D. Fla. 2006) (holding that retail store managers charged with maintaining the proper functioning of their stores are exempt employees under the FLSA despite having spent 80% of their time on non-exempt labor); *Diaz v. Team Oney, Inc.*, 2008 WL 9463871, at **6-7 (S.D. Fla. Apr. 29, 2008) ("Many other courts have found managers of retail establishments to be exempt even when such managers spent a large portion of their time completing non-exempt tasks."); *Severin*, *supra* ("Even if Plaintiff spent 80 percent of her time performing non-managerial duties, the other factors identified in 29 C.F.R. § 541.103 compel a conclusion that Plaintiff's employment falls within the executive exemption to the FLSA."); *see also Jones v. Virginia Oil Co.*, 69 Fed. App'x 633 (4th Cir. 2003) (*per curiam*) (manager of Dairy Queen and convenience store exempt although she spent 75-80% of her time performing tasks such as cooking, cleaning and operating the cash register because, while performing the non-exempt tasks, she was simultaneously performing managerial tasks); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104 (9th Cir. 2001) (managers at recreational vehicle park who spent 90% of time performing non-exempt work, and who received one to two visits per month from supervisors, were exempt); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 865-67 (N.D. Tex. 2001) (management was department manager's primary duty even though he contended that he spent 90% of his time "performing the exact same work as hourly employees").

Courts have applied the managerial exemption on facts even more closely mirroring those here:  involving employees, like Plaintiff, in assistant management positions at retail employers where the primacy of their managerial duties trumped significant non-exempt activities.  For example, in *Diaz*, the plaintiff worked as an assistant manager in a retail establishment and

performed exempt executive work such as supervising other employees, managing the budget, and making deposits, while spending a significant portion of his time performing non-exempt tasks. *Diaz*, 2008 WL 9463871, at **6-8. The *Diaz* court held that the plaintiff "fit perfectly" the profile of an exempt assistant manager described in 29 C.F.R. § 541.700(c).[1]  *Id*. ("[T]he record evidence shows that even when performing non-management duties such as making pizzas or greeting customers, Plaintiff simultaneously continued his management duties through his supervision of the other employees."). Similarly, in *Jackson*, plaintiffs attempted to "down-play and minimize the importance" of their managerial tasks by stressing that "the majority or bulk" of their time was spent performing non-managerial duties, such as selling to customers, operating the register, cleaning the store, and performing other incidental tasks. *Jackson*, 362 F. Supp. 2d at 1335. The court found that plaintiffs' manual tasks "were performed simultaneously with their managerial functions," which included plaintiffs' "responsib[ilities] for running the store and performing, among other things, the following tasks:  delegating tasks to other employees; counseling or disciplining other employees; training employees; adjusting work schedules, handling customer complaints and customer refunds; and ensuring that the cash in the registers was correct, preparing bank deposits and end of day reports, and approving paid-outs. *Id*. at 1334-35 (record citations omitted). The court concluded that store management was the assistant managers' primary duty. *Id*. at 1335-36.

The facts here, like those in *Diaz*, *Jackson*, *Posley*, and others, demand the conclusion that Plaintiff's primary duty was management.

---

[1] That regulation provides:  "Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register."  29 C.F.R. § 541.700(c).

Furthermore, the record demonstrates that Plaintiff enjoyed significant freedom from supervision. She had almost no contact with, let alone supervision by, Defendant's corporate management. She had little contact with her immediate supervisor, Callejas, while on shift. Callejas stated that he "depended on the Assistant Store Managers to use their best judgment when managing the Store and handling employee, customer, vendor and operational issues" and "depended on [Plaintiff] to make good decisions" when she was the "sole manager on duty." Plaintiff used her discretion in ensuring the Store's overall operations while alone on shift, conducting applicant interviews, devising employee work schedules, assigning work to employees, and attending to certain risk-management issues. Where oversight was required, Plaintiff's recommendations were almost always accepted by Callejas. Compelling examples of Plaintiff's exercise of unfettered managerial responsibilities include her authority to sanction an employee based on her own determination as to whether the employee had provided a "good excuse," and Plaintiff's authority to address and resolve customer complaints during her shifts, including the sole authority to void purchases and make refunds.

The fact that Plaintiff adhered to instructions and guidelines set by her immediate supervisor and Defendant's corporate office in fulfilling her managerial responsibilities does not alter the analysis. The managerial exemption is applicable to employees who exercise sufficient discretion within the confines of even strict employer policy. *See Donovan*, 672 F.2d at 521-22 (assistant managers at fast food restaurant exempt as executives, even though management duties were governed by highly detailed and uniform standards and they also performed non-managerial duties); *Langley*, 503 F. Supp. 2d at 1303 ("[E]ven if the [district managers] circumscribed Plaintiff's discretion to a large degree by issuing instructions to Plaintiff, including instructions from a corporate manual, that would not negate the fact that Plaintiff was

charged with the task of ensuring daily compliance with corporate policy or with instructions from the [district managers].”); *Pendlebury*, 2008 WL 763213 at *7 (“The fact that store managers’ discretion might be circumscribed by corporate policy is unavailing”).   It was Plaintiff’s responsibility to put Callejas’ instructions and corporate policy into practice, and she did, in fact, exercise substantial managerial discretion within the parameters set by her supervisors.

The possibility that Beltran may have had a position superior to Plaintiff’s, or that certain department heads at the Store may have also reported directly to Callejas in addition to Plaintiff, does not unsettle these findings.   Defendant’s or the Store’s management structure is not dispositive.   The managerial exemption will apply so long as Plaintiff’s primary duty is management, which it clearly was even if Beltran as the “first assistant.   Further, Plaintiff has admitted that she directly supervised between twenty and thirty employees – and the record overwhelmingly bears out her supervisory role, regardless of the possibility that those within Plaintiff’s managerial purview also reported directly up the chain.

Finally, Plaintiff’s salary was significantly higher than – close to double – those of the non-management employees she supervised.   In addition, Plaintiff, along only with the Store’s other management team, was eligible for a year-end incentive-based bonus.

Overall, the record is undisputed that the primary value of Plaintiff’s employment was its management component.   Defendant considered Plaintiff part of its management team.   The Store’s schedule was set to ensure that one of its management staff – Callejas, Beltran or Plaintiff – was present at all times.   As the sole certified food manager during her shifts, the Store could not even remain open without Plaintiff.   Plaintiff saw herself as a “leader” with a “proactive” work style.   She admitted that she was not hired for the manual tasks she performed.

Rather, Plaintiff described her principal duties as sales and customer service, and supporting what she described as the Store's primary goals of customer satisfaction and maximizing profitability.

There are no genuine issues of material fact with regard to Plaintiff's primary responsibilities and activities as Defendant's employee.[2]  The Court therefore finds that, as a matter of law, an examination of the tasks Plaintiff performed reveals that her primary duty was management.

### 3.       Plaintiff's Role in Hiring and Firing Employees

The FLSA's managerial exemption will only apply to an employee "[w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100 (conjunctive test); *see Brillas*, 675 F. Supp. 2d 1169 ("The regulations do not apply to those who do not have the authority to hire or fire.").  As specified in the regulation, the management employee need not have exclusive or independent authority to hire or fire, but their suggestions or recommendations must be afforded particular weight in personnel decisions.  *See also Pinillia v. Northwings Accessories Corp.*, 2007 WL 3378532, at *3 (S.D. Fla. Nov. 13, 2007) (applying exemption where "plaintiff's suggestions and recommendations as to personnel decisions were indeed given particular weight"); *Dipasquale v. Docutek Imaging Solutions, Inc.*, 2010 WL 4703752, at *8 (S.D. Fla. Nov. 12, 2010) (hiring/firing prong satisfied where employee's recommendations were overruled "only on a couple of occasions").

---

[2] The Court need not address the disputed issue of how many hours Plaintiff actually worked.  For purposes of the instant Motion, Defendant has accepted Plaintiff's contention that she worked in excess of her scheduled forty-five to forty-eight hours per week.  Further, that issue is not material to the instant Motion, because, under the facts not subject to dispute, the managerial work she performed, relative, in importance and time, to her non-exempt work, is unaffected by how many hours she actually worked.

Here, the record is clear that Plaintiff had a significant role in Defendant's hiring process for the Store, and that her recommendations as to hiring new Store employees were adhered to the vast majority of the time.  Callejas delegated to Plaintiff the responsibility for conducting initial applicant interviews.  Plaintiff conducted an initial application and interview for all potential employees.  While the initial application consisted of a list of ten questions set by the Defendant, Plaintiff would notate the application with her specific impressions regarding the applicant's suitability for employment at the Store as well as her overall recommendation.  The vast majority of the time, Callejas accepted Plaintiff's recommendation to or not to interview and hire an applicant; Plaintiff could recall only a few instances of an applicant's hiring against her recommendation.  Plaintiff's role in personnel decisions continued through a new employee's probationary period, where she helped train employees and provided recommendations as to their progress during probation.  Her role in firing employees was more circumscribed – she provided recommendations, but all parties understood that the decision to terminate was Callejas' alone.

As with Plaintiff's managerial role, the fact that Plaintiff followed Defendant's guidelines in conducting employee intake interviews and providing her recommendations does not diminish her managerial role.  She interviewed and screened employee applicants, and her hiring recommendations were given near-conclusive weight.  Plaintiff clearly satisfies this element of the managerial exemption test.

### 4.    The Executive/Managerial Exemption Applies to Plaintiff

The facts here establish that Plaintiff was "employed in a bona fide executive . . . capacity" within the meaning of the FLSA and relevant regulations.  Defendant has met its

burden.  The Court therefore finds that Plaintiff is an employee exempt from the overtime provisions of the FLSA.

**B.**     **Administrative Exemption**

Defendant also argues that Plaintiff qualifies for the administrative exemption from the FLSA's overtime pay requirements.  *See* 29 C.F.R. § 541.200.  Because the Court concludes that Plaintiff is exempt based on the executive/managerial exemption, it need not reach or address this issue.

## V.     CONCLUSION

In light of the foregoing undisputed facts and conclusions of law, in which the Court determined that the executive/managerial exemption to the FLSA's overtime requirements applies to Plaintiff, it is hereby **ORDERED and ADJUDGED** that Defendant B & R Supermarket, Inc.'s Motion for Summary Judgment, ECF No. [34], is **GRANTED**.

The Clerk of Court is directed to **CLOSE** this case and **TERMINATE** any impending deadlines.  Any pending motions are **DENIED** as moot.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 28th day of October, 2014.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record